**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

URBANRIDE, INC.,
Plaintiff,

v.                                          Civil Action No. 1:23-cv-06999

URBAN WORLDWIDE, INC.
Defendant

**Expert Report of Rob Wallace**

January 14, 2025

## I.    <u>Introduction</u>

1.      I was engaged by Morris, Duffy, Alonso Faley & Pitcoff, LLC, counsel for Defendant, Urban Worldwide, Inc., to provide my expert opinion in the matter of UrbanRide, Inc. versus Urban Worldwide, Inc.  I was specifically asked to provide my opinions on the likelihood that the relevant public of the ride share industry perceive the two marks in question as coming from the same or affiliated sources.

2.      Among other things, I was asked to conduct an empirical, court-compliant survey designed to test the marks as they are engaged by the relevant public, e.g. in the context of their websites (where they are most frequently first engaged) and in the context of their ride engagement emails (sent at the point of engagement for each service).

3.      My opinions consider the information provided to me, as cited, publicly available information, as cited, the results of the survey findings, as cited, my over 45 years of brand identity and brand communications expertise for a large number of consumer brands, as cited in Appendix 3 of this report, and my 25 years of work as an expert witness, as summarized in Appendix 4 of this report. This report constitutes my findings as outlined below. I understand I may be provided with additional information or asked to perform further analysis. If so, I reserve the right to amend or supplement my opinions in connection with my anticipated trial testimony.

## II.   <u>Summary of Qualifications</u>

4.      I was the Managing Partner for more than 30 years of one of the branding industry's most respected brand identity strategy and design firms, Wallace Church & Co. I am currently the Managing Partner of Best of Breed Branding Consortium, an omni-channel branding consultancy that also focuses on all the branding issues involved in this case.

5.      Based on this experience, I have highly specialized knowledge of how marketers

create, design and establish brand marks, how consumers interpret brand names and brand messaging, how they develop awareness and perceptions of brands, and all the other marketing/branding issues in this case.

6.      As outlined in my Curriculum Vitae, in Appendix 3 of this report, I have been actively involved in hundreds of brand naming, brand identity, and brand messaging assignments for dozens of leading consumer product and service companies. Of specific relevance to this case, my firm and I developed brand messaging for Anheuser-Busch, Coca-Cola, Procter & Gamble, PepsiCo, Pfizer, Nestle, Johnson & Johnson, Target, The Home Depot, Kraft, General Mills, Miller Coors and more than 100 additional national and global brand owners.

7.      As part of my experience as a brand identity strategist, I participated in developing, fielding and/or analyzing well over one thousand consumer surveys and research projects. As a result, I have unique knowledge of how brand names and marks impact purchase intent and how brand identities are meaningfully differentiated so as to create the perception that they are not the same as or affiliated with other brands.

8.      I served on the Board of Directors of The Design Management Institute, the largest global organization in the brand design and strategy industry, for 10 years. There I founded and co-chaired the Design Value Project, which focused on determining the return on investment of brand messaging and brand identity. As such I have been referred to as "the thought leader in quantifying brand design's value." I have delivered keynote presentations on this topic at more than 50 branding industry symposia across the US, Canada, Europe, Latin America and Asia. I have lectured at the graduate level at The Columbia School of Business, The SVA Masters in Branding Program, Georgetown University, University of Texas, Seton Hall University, and other educational institutions. Again, my full Curriculum Vitae is attached in Appendix 3 of this report.

## III.    <u>Previous Testimony and Expert Opinions</u>

9.      My testimony and opinions have been accepted by and admitted in proceedings both before U.S. District Courts and before the USPTO Trademark Trial and Appeal Board (also known as the "TTAB"). I have served as an expert witness on more than 95 cases concerning intellectual property infringement, trademark and trade dress infringement, false or deceptive advertising and brand messaging, and other marketing/branding industry issues. In such capacity I have designed and conducted court-compliant surveys for more than 70 of these cases. I have been deposed and/or testified in court as an expert witness more than 40 times. My substantial experience in branding, marketing and survey development provides me with the background necessary to prepare and analyze the survey described in this report. A listing of my legal expert witness cases completed in the last 4 years is attached as Appendix 4 of this report.

## IV.    <u>Compensation</u>

10.      I am being compensated in connection with my engagement in this proceeding at the rate of $400 per hour for report writing and $500 per hour for deposition and trial testimony. I have received no additional compensation for my work in this proceeding. My compensation is in no way dependent upon the outcome of this proceeding.

## V.  Summary of Opinions: There is no relevant likelihood of confusion between the Urban Ride and Urban Worldwide marks

11.  The court-compliant survey I conducted confirmed that there is no relevant confusion between the sources of the UrbanRide and Urban Worldwide marks as engaged on their websites nor as perceived in their ride engagement emails and forms.   The survey results indicate only a 4.7% net level of confusion between these marks as engaged by their websites and a 4% level of confusion based on their ride engagement emails and forms.  This falls well below the commonly court-accepted standard for establishing likelihood of confusion requiring that more than 15% of the population must associate the marks with the same or affiliated source before confusion is established.[1]   Please see a detailed description of these results below.

## VII.    Investigation Performed

12.  I have received and reviewed the documents outlined in Appendix 1 of this report. I also designed, oversaw the implementation of, and analyzed the results of a court-compliant consumer survey. Raw and tabulated survey results are documented in this report and were also submitted as separate documents with this report.

## VI.    Summary of the Case

13.  **Mark Registrations, Years in Business and Overall Rides Completed**:
The issues in this case have been well documented in the Complaint.[2] In brief summary, it is my understanding that UrbanRide registered its mark in 2011 and has offered car services within the United States since 2000. It is also my understanding that Urban Worldwide provides car services within the United States and internationally. While data have not been provided, I believe that a conservative estimate of the total number of car service engagements that UrbanRide and Urban Worldwide have provided must be at least within the multiple hundreds of thousands of engagements since their founding.

14.  **Minimal Evidence of Actual Confusion**
In reviewing the provided evidence of confusion[3], I noted that it consisted of emails referencing 24 occurrences of actual confusion where, for example, drivers invoiced Urban Worldwide for efforts conducted for UrbanRide (e.g. Request #1).   Based on my conservative estimate of the multiple hundreds of thousands of engagements that UrbanRide and Urban Worldwide have both completed, these 24 reported cases of actual confusion represent an exceptionally small percentage of engagements where confusion exists (e.g. if a conservative estimate of 300,000 total engagements between both firms is used, then 24 instances of confusion represent only .008% of all transactions/engagements).   I am aware that confusion traditionally exists across the ride share industry at what I believe to be a much higher percentage than the evidence in this

---

[1] "Courts will often state that a survey finding 15% or more is sufficient to support likelihood of confusion, while under 15% suggests no likelihood of confusion". *See, e.g., 1-800 CONTACTS, INC. v. Lens. com, Inc.*, 722 F. 3d 1229, 1248-49 (10th Cir. 2013)
[2] Confusion - Case 123-cv-06999 Urbanride Inc. v. Urban Worldwide Inc. (Our Ref. 06058-0004).msg
[3] UWW000001-UWW000203

case indicates. For example, in a Google search for "Lyft driver billed Uber" the primary response is "If a Lyft driver is billed by Uber, they can contact Lyft customer service to dispute the charges". In a search for " Lyft rides billed to Uber" the primary result states: "If a Lyft ride is billed to your Uber account, it likely means there was an error with your payment information, potentially due to accidentally using the wrong app…"[4] Additional responses to the same search state " If a Lyft driver is billed by Uber, they can contact Uber to request reimbursement. "[5] A search for "Reddit Uber drivers incorrectly billing Lyft" reveals a number of posts of car service drivers who incorrectly charged their rides to the wrong organization. It states "According to discussions on Reddit, a common complaint about Uber drivers is that they sometimes charge incorrect fares…"[6] This issue is so evident that both Lyft and Uber have sections of their sites that are devoted to improper billing protocols[7] All of this evidence in a strong indication to me that billing confusion among car services drivers is a somewhat common occurrence that takes place much more often than the .008% of engagements confirmed in this case. In addition, these errors have nothing to do with confusion between the marks nor their sources but rather digital transaction mistakes or traditional human error, which may well have been the cause of the 24 instances of reported confusion in this matter.

15. **Diligent Qualification and Ride Acceptance Process**

I understand that both UrbanRide and Urban Worldwide engage their potential drivers and third-party car service companies through a diligent process to qualify them as resources. For example, I understand that car and liability insurance coverage needs to be validated at the onset of their initial engagement.[8] In addition, once these resources are approved as partners, they receive detailed emails and ride engagement forms confirming each potential ride's source, including the source confirmation email address[9]. As a result of this diligent pre-approval process and the detailed confirmation of each ride at its very onset, I conclude that there is most probably a high level of awareness between these parties and their drivers/third party partners. I believe that this process results in the exceptionally small percentage of actual confusion that exists between these parties' brands, as is quantified above.

16. **UrbanRide is a descriptive mark used by other ride share brands**

As a leading brand identity consultant, my team and I have named dozens of consumer brands and services. As part of that process, I have a relevant understanding of when a brand name describes the service it provides. While I am not an attorney, nor do I question the USPTO's registration decisions, as an IP infringement expert it is my understanding that a descriptive term cannot be confined to one mark. In my analysis URBANRIDE is a descriptive mark, in that it clearly describes the urban environments where its rides are provided. In fact, this mark is somewhat generic in that it is shared by a number of car services such as Urban Rides (https://urbanrides.in/), a car service company servicing the cities of North Carolina, Urban Ride Bus Services (https://www.urbanride.co.in), and perhaps others. In fact, URBAN

---

[4] Google response to "Lyft driver billed Uber": www.google.com
[5] Ibid
[6] Google response to "Reddit Uber drivers incorrectly billing Lyft": www.google.com
[7] https://help.uber.com/riders/search?q=improper%20invoice and https://help.lyft.com/hc/en-us/search/improper%20invoice
[8] UWW000009-11
[9] UWW000015-16

WORLDWIDE was named URBAN LIMOS in 2012 and later URBANBCN in 2016. I believe this to be credible evidence that the URBANRIDE mark is generic and cannot claim likelihood of confusion.  However, despite this belief, I still created a court-compliant survey to empirically determine if the URBANRIDE and URBAN WORLDWIDE marks are perceived to come from the same or affiliated sources, as outlined below.

   17. **UrbanRide successfully worked with UrbanBCN with no issues**
I further understand, through discussions with counsel, that in his deposition, the CEO and co-founder of URBANRIDE, Jeremy Milikow, testified that URBANRIDE and URBAN WORLDWIDE actually worked successfully together with no reported conflicts and no meaningful confusion when URBAN WORLDWIDE was named URBANBCN in 2016.  This further confirms to me that there is no meaningful confusion between the current marks.  As mentioned, I still conducted a court compliant survey to affirm any possible likelihood of confusion within the ride share industry, as described in the following section.

## VII.   Survey Design

   18.   The design and results of these surveys are discussed in detail in the following pages. The full survey questionnaire and its tabulated results have been submitted as separate documents along with this report as indicated in Appendix 2.

   19.   This survey was conducted between December 26, 2024 and January 13, 2025. This survey was conducted under my direction in accordance with the principles and standards delineated in the Manual for Complex Litigation, Fourth Edition, 2004, prepared for the Federal Judicial Center.[10]  These principles provide the best assurance that the data collected is valid and can be relied upon to draw conclusions regarding consumer opinions. These principles provide that:

   a.    The proper universe(s) should be properly chosen and defined;
   b.    The sample of respondents chosen from the proper universe should be representative of that population;
   c.    The questions asked should be clear and not leading;
   d.    The data gathered should be accurately reported;
   e.    The data should be analyzed in accordance with accepted statistical principles;
   f.    The surveys should be conducted by qualified persons following proper interview procedures;
   g.    The surveys should be conducted in anticipation of litigation and by persons not connected with the parties or counsel or by persons aware of its purpose in the litigation.[11]

   20.   The sample selection, questions, questionnaire design, and interviewing procedures employed in the survey are designed in accordance with the generally accepted standards and procedures to meet the criteria for survey trustworthiness detailed in the Manual for Complex

---

[10] Manual for Complex Litigation, Fourth Edition, 2004.
[11] Ibid.

Litigation[12].  This includes the choice of control questions in the screener so as not to bias the respondent or make them aware of the screener criteria.

## VIII.  <u>Stimuli replicates how the public engages these marks-in the context of their websites and their engagement emails</u>

21.    To be court-compliant, a survey must replicate how the relevant public engages these marks. [13]  Based on conversations with counsel, I understand that car service providers first engage these organizations through their websites where they need to apply to become approved resources.  Once they are approved resources, the car service provider is then contacted via an email with an engagement form at the very onset of every engagement.  Based on this knowledge, the stimuli this survey used replicated how the marks are first engaged on their websites and then engaged on an ongoing basis at the onset of every engagement based on the emails and engagement forms, as indicate below:





---

[12] Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011.

[13] When developing a survey, a survey expert should attempt to create realistic stimuli and attempt to replicate real marketplace conditions", Surveys in Act Matters,  Jacqueline Chorn, Marcello Santana and Brian Sowers, IP Litigator, 2020   https://ams-litigation.com/wp-content/uploads/2021/01/IP-Litigator-Article-2020.pdf

**From:** dispatch@urbanworldwide.com
**To:** abc@gmail.com

**Re: Pick Up DTW 12-05-24 11:00 am**





IX.    **Proper Qualifying Universe**

22. Addressing operational issues, the Reference Manual on Scientific Evidence states: "One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (i.e., objects, individuals, or other social units) whose characteristics or perceptions the survey is intended to represent."[14]    A series of screening questions were asked to confirm the proper universe of respondents. I determined that the appropriate universe for this survey would comprise 200 men and women, age 18 to 75, who have worked in the limousine industry and contracted rides directly through third-party sources and then billed these third-party companies for their ride services.

23. Because a proper survey universe must include past as well as potential future relevant members[15], an additional screening question confirmed that survey respondents had worked in the rider share industry in the last 12 months and plan to continue to do so in the upcoming 12 months.

24. Additional screening questions extracted from the final result respondents who were likely to have atypical knowledge of the car services industry, consumer surveys, or the issues in this litigation. These included respondents who worked or who had a family member that works for an advertising agency, a consumer research firm, a law firm, or a third party car service booking firm. To prevent respondents from being primed as to the purpose of this survey, e.g. thinking that this survey was exclusively about car services, a non-related control question was also asked, asking if they or a member of their family worked for a golf club manufacturer. Only those who were qualified by this screening criteria were accepted into the survey.

25. Traditional screening questions asked if they could effectively see the survey questions (e.g. "If you wear glasses, will you be wearing them while taking the survey?"). Because the survey included images of the parties' websites and engagement forms, I permitted only those who were taking the survey on a laptop, a desktop, or a tablet. Those taking the survey on a phone were excluded. And lastly, the screener ensured respondents were answering accurately, e.g. "Please understand that we are only interested in your opinions or beliefs. If you don't have an opinion or belief or don't know the answer to a question, that is an acceptable answer. Do you agree not to guess or get information from the internet or any other source." Only those that answered "Yes" to that question and met all of the prior screening criteria were permitted to proceed.

26. Based on my experience and credentials as a survey expert, it is my opinion that the respondents meeting this survey's screening requirements are representative of the relevant consuming public for this matter.

X.    **Sample Size**

27. The Reference Guide to Survey Research states: "The surveyor's job generally is easier if a complete list of every eligible member of the population is available so that the sampling

---

[14] Ibid, page 376.

ACTIVE 703164263v2

frame lists the identity of all members of the target population."[16] A sample drawn at random from such a list would be a true probability sample. A complete list of all members of the universe for this inquiry was not available, which means that a true probability sample was not possible. That is, there does not exist an exhaustive list of every person over the age of 18-75 year olds who meets all of the screening requirements. Therefore, a non-probability sample of 200 qualified respondents was used. Non-probability samples of this size are and have been used to make consequential academic and business decisions and are also accepted into evidence in courts throughout the country, specifically when the universe of all qualified care service industry is much smaller and more exclusive than traditional consumer audiences.[17]

## XI.     Interviewing Medium: On-Line Survey

28.     The Council of American Survey Research Organizations, now Insights Association, reported that in 2012 their members conducted more surveys on-line via the internet than by all other methods combined. As an example of its pervasiveness, internet surveys were conducted 10 times more often than mall intercept surveys. The use of internet surveys is thus "in accordance with generally accepted standards of procedure in the field."[18] An on-line survey was also appropriate in that the car share industry is traditionally engaged via email on-line.

29.     An on-line survey was an especially appropriate interviewing medium for this survey because it required showing specific stimuli in a randomized order to a representative sample of respondents meeting the screening requirements previously discussed.

## XII.     Sophistication of the Respondent Paneling and Survey Fielding Teams

30.     The survey was fielded by the internet survey firm, Illume, Inc. Illume is widely respected in the marketing research industry and has created hundreds of surveys that have been accepted by the courts and more than one thousand surveys for the marketing and branding industries. Illume programmed the study using the Sawtooth Software's Lighthouse Studio software suite as it does to program all of its surveys. Sawtooth Software has been providing market research data collection and analysis software since 1983. It uses IBM's SPSS software for data analysis. SPSS has been widely used for over 50 years and is recognized as the forerunner in data analysis software. Illume also uses Sawtooth Software's web hosting services for hosting all of their surveys. All surveys are secure using TLS 1.2, AES with 128 bit encryption (High); ECDH_P256 with 256 bit exchange, which ensures optimal security.[19]

31.     Illume coordinated the respondent recruitment using the paneling firm Innovate MR. Innovate MR recruited respondents from a diverse blend of channels to ensure representativeness, including both online and offline publishers, social networks like Facebook, web and SMS databases, advertising networks, and television ad placement. They use a dynamic profiling system that captures and localizes data points based on geography and tracked respondent

---

7. Ibid.
[17] https://rmsresults.com/2010/07/07/400-is-the-magic-number-market-research-in-central-ny/
[18] Reference Guide on Survey Research, Shari Seidman Diamond, West Group, St. Paul, MN, 2011, pp 377.
[19] http://www.illume-research.com/aboutus.html.

behavior longitudinally using advanced algorithmic solutions designed to evaluate their profile on an ongoing basis, which ensures accuracy and authenticity is maintained.[20]

32.    Illume tracked the time required for each respondent to complete the survey. The data from those who completed the survey too quickly or too slowly was eliminated, so as to extract "speeders" and "laggers" or those that might not have been giving the survey their full attention or getting information from outside sources.

## XIII.    "Double Blind" Protocol and Meeting All Acceptable Survey Standards

33.    Because of the way the questions were crafted, and because at no time were the parties' names or identities disclosed to Illume or Innovate MR, neither the survey programmer nor the respondents knew the purpose of the survey. In addition, there was no question which suggested the survey's sponsor or purpose. This "double blind" protocol means that neither the programmer nor the respondents could intentionally or unintentionally influence the results.

34.    In my expert opinion, all seven of the standards delineated in the Manual for Complex Litigation, Fourth Edition, 2004[21] were observed in this survey. Furthermore, the following additional safeguards were observed:

    a.    Respondents were told to answer honestly and not to guess.

    b.    Respondents who needed glasses to properly see the stimuli were required to wear them.

    c.    Respondents were told that it was permissible to have no opinion about a subject, and thus that they should not feel the need to guess at an answer nor receive any information from an outside source.

    d.    A control protocol was used to account for survey "noise."

    e.    If respondents had any extraordinary knowledge, e.g. if they or their family members worked at an ad agency, consumer research firm, a law firm, or a computer technology or e-commerce firm, they were excluded from the pool.

    f.    If they were taking the survey on their phone and therefore not able to properly see the stimuli they were excluded from the pool.

    g.    Finally, the survey was "double blind" meaning neither the survey company nor the respondents knew the sponsor or the purpose of the study, thus, neither could influence the results, if even unwittingly.

---

[20] https://www.innovatemr.com/panels/consumer-panel/
[21] Manual for Complex Litigation, Fourth Edition, 2004.

## XIV.   <u>Survey Questions and Tabulated Results:"</u>

35.     This section of the report summarizes the survey questions and their results, which are detailed in three documents that were submitted with this report, "UrbanRideSurveyScreenGrabs", "UrbanRide Final Data 1_13_25" and "UrbanRide Tabulated Data 1_13_25", as listed in Appendix 2.

36.     The first primary survey question asked:

> *"You are interested in working for a third-party limousine company that will hire you to accept rides for their customers.   You review websites for several third-party limousine companies.  In this search you engage the following website home pages:*

The following images of three captioned images were presented to respondents in randomized order:







37. The question them continued:

"*Do you believe that any of these websites come from the same or affiliated companies?*"

Randomize responses included:

*Yes, **URBANRIDE** and **URBAN WORLDWIDE** websites come from the same or affiliated limousine companies*

*Yes, **URBANRIDE** and **DELUX WORLDWIDE** websites come from the same or affiliated limousine companies*

*Yes, **URBAN WORLDWIDE** and **DELUX WORLDWIDE** websites come from the same or affiliated limousine companies*

*No, none of these websites come from the same or affiliated limousine companies*

*Don't know*

As indicated in the chart below, the tabulated results indicate that 12% of the population believed that URBANRIDE and URBAN WORLDWIDE are the same or affiliated sources. When those that believe that that the control DELUX WORLDWIDE stimuli was from the same or affiliated source as URBANRIDE and URBAN WORLDWIDE, it resulted in an average 7.3% of the population. Subtracting this 7.3% control average from the 12% primary response, results in a net level of confusion between the marks in questions, based on the websites, as 4.7% of the population, well below the 15% standard used to determine likelihood of confusion.

ACTIVE 703164263v2

**Q10a - Do you believe that any of these websites come from the same or affiliated companies?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBANRIDE and URBAN WORLDWIDE are the names of the same or affiliated limousine companies | 24 | 12.0 | 100.0 | 100.0 |
| Missing | System | 176 | 88.0 | | |
| Total | | 200 | 100.0 | | |

**Q10a - Do you believe that any of these websites come from the same or affiliated companies?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBANRIDE and DELUX WORLDWIDE are the names of the same or affiliated limousine companies | 9 | 4.5 | 100.0 | 100.0 |
| Missing | System | 191 | 95.5 | | |
| Total | | 200 | 100.0 | | |

**Q10a - Do you believe that any of these websites come from the same or affiliated companies?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBAN WORLDWIDE and DELUX WORLDWIDE are the names of the same or affiliated limousine companies | 20 | 10.0 | 100.0 | 100.0 |
| Missing | System | 180 | 90.0 | | |
| Total | | 200 | 100.0 | | |

38.     A follow up question to confirm the validity of the earlier answers then asked:

*"Why do you say that? Please be as clear but concise as possible."*

These open-ended responses all were consistent with and affirmed the answers tabulated above.

39.     A question was then asked to determine if the engagement emails sent from the sources in question might cause confusion between their sources.  It asked:

13

*"Once you have been listed with several of these companies, you receive a direct inquiry from a third-party limousine company to book you for picking up one of their customers. This inquiry comes as a direct email from dispatch@urbanbcn.com.   They identify themselves as Urban Worldwide as indicated in the email below:"*

The following stimulus was then presented:

**From: dispatch@urbanworldwide.com**
**To: abc@gmail.com**

**Re: Pick Up DTW 12-05-24 11:00 am**



This question and following closed-ended responses, in random order, followed:

ACTIVE 703164263v2

*You accept this ride. Who do you bill for this service?*

**URBAN WORLDWIDE**

**URBANRIDE**

**DELUX WORLDWIDE**

*Don't know.*

40.     As indicated in the chart below, among the test set of those that viewed the URBANRIDE email and form, the tabulated results indicate that 92% of the population believed that URBAN WORLDWIDE is the source of this email and whom the respondent would bill for their services. Only 6% of the population reported confusion in that they perceived this email to come from URBANRIDE. In contrast, 2% of the population believed that the email came from the control response DELUX WORLDWIDE. When the control score is subtracted from the confusion score, it results in a 4% net level of confusion between these marks in question based on the URBAN WORLWIDE email and form.

| Q12a - Who do you bill for this service? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | URBAN WORLDWIDE | 92 | 46.0 | 92.0 | 92.0 |
| | URBANRIDE | 6 | 3.0 | 6.0 | 98.0 |
| | DELUX WORLDWIDE | 2 | 1.0 | 2.0 | 100.0 |
| | Total | 100 | 50.0 | 100.0 | |
| Missing | System | 100 | 50.0 | | |
| Total | | 200 | 100.0 | | |

41.  A further confirmation question was asked of an URBANRIDE email and engagement form. It stated:

*Later you get an inquiry for another client engagement. This inquiry comes as a direct email from dispatch@urbanride.com. They identify themselves as Urban Ride as indicated in the email below:*

15
ACTIVE 703164263v2



*You accept this ride. Who do you bill for this service?*

As indicated in the chart below, the tabulated results of this question are exceptionally similar to the earlier question regarding the URBAN WORLDWIDE question. Results indicate that 92% of the population believed that URBANRIDE is the source of this email and whom the respondent would bill for their services. Only 5% of the population reported confusion in that they perceived this email to come from URBAN WORLDWIDE. In contrast, 1% of the population believed that the email came from the control response DELUX WORLDWIDE. When the control score is subtracted from the confusion score, it results in a 4% net level of confusion between these marks in question based on the URBANRIDE email and form.

16

| Q14a - Who do you bill for this service? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | URBANRIDE | 92 | 46.0 | 92.0 | 92.0 |
| | URBAN WORLDWIDE | 5 | 2.5 | 5.0 | 97.0 |
| | DELUX WORLDWIDE | 1 | 0.5 | 1.0 | 98.0 |
| | Don't know | 2 | 1.0 | 2.0 | 100.0 |
| | Total | 100 | 50.0 | 100.0 | |
| Missing | System | 100 | 50.0 | | |
| Total | | 200 | 100.0 | | |

42.  A follow up questions to the two questions asked:

*"Why do you say that? Please be as clear but concise as possible."*

Again, all open-ended responses were consistent with earlier responses as tabulated in the charts above

## XV.    Control Questions and Stimuli

43.    This survey employed a design using a test versus a control format. This is used to determine the impact of a variable of interest beyond the baseline level of impact of exogenous variables in the marketplace so as to extract "survey noise" or responses that may not accurately represent the opinions of the relevant consuming public because some respondents may not have been paying full attention or speeding though the survey.  This process is also used to validate the primary results. This process asks the identical questions to a separate segment of respondents based on different but similar stimuli.  If the results among the control set are similar to those of the primary set, this validates the accuracy of these results .[22] In my experience, courts value survey results that are validated through a test and control format, specifically when the results of the primary and control set are similarly comparable.

44.    Based on this criteria, I selected a comparable but non infringing DELUX WORLDWIDE brand website and engagement email stimuli indicated below:

---

[22] Reference Guide on Survey Research, Shari Seidman Diamond, West Group, St. Paul, MN, 2011, pp 258.





45.     The same questions as those asked of the primary stimuli were asked of these control stimuli to a separate but equal number of respondents selected at random.    Adding these control stimuli completes this survey's compliance with the generally accepted standards and

procedures for survey trustworthiness detailed in the Manual for Complex Litigation.[23]

46.    As indicated in the charts below, the control set results to the question on the source of the websites (question 10b) are exceptionally similar to responses for the primary set (question 10a). Specially, 10.5% of the population believed that URBANRIDE and URBAN WORLDWIDE are the same or affiliated sources (comparable to the 12% of the primary set responses). When the results of those who believe that DELUX WORLDWIDE was from the same or affiliated source as URBANRIDE and URBAN WORLDWIDE were averaged, it indicates a 6.25% result (comparable to the 7.3% primary results). Subtracting this 6.25% control average from the 10.5% confusion response, results in a net level of confusion between the marks in questions of 4.25% (comparable to the primary set's 4.7% net result)  Again, the extreme similarity of these responses supports the validation of these results.

**Q10b - Do you believe that any of these websites come from the same or affiliated companies?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBANRIDE and URBAN WORLDWIDE are the names of the same or affiliated limousine companies | 21 | 10.5 | 100.0 | 100.0 |
| Missing | System | 179 | 89.5 |  |  |
| Total |  | 200 | 100.0 |  |  |

**Q10b - Do you believe that any of these websites come from the same or affiliated companies?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBANRIDE and DELUX WORLDWIDE are the names of the same or affiliated limousine companies | 7 | 3.5 | 100.0 | 100.0 |
| Missing | System | 193 | 96.5 |  |  |
| Total |  | 200 | 100.0 |  |  |

**Q10b - Do you believe that any of these websites come from the same or affiliated companies?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBAN WORLDWIDE and DELUX WORLDWIDE are the names of the same or affiliated limousine companies | 18 | 9.0 | 100.0 | 100.0 |
| Missing | System | 182 | 91.0 |  |  |
| Total |  | 200 | 100.0 |  |  |

---

[23] Manual for Complex Litigation, Fourth Edition, 2004

47.     The results of the source of the control stimuli, the DELUX WORLDWIDE email/engagement form (question 14b) are also exceptionally similar to the primary set (question 14a). Specially, 94% of the population believed that DELUX WORLDWIDE is the source of this email/form and whom the respondent would bill for their services (versus 92% who correctly identified URBAN RIDE as the primary stimuli source). Only 4% of the population reported confusion in that they perceived this email to come from URBAN WORLDWIDE and, 1% believing it came from URBANRIDE. (versus 5% and 1% respectively). Again, these highly similar results further validate them as being accurate.

| Q14b - Who do you bill for this service? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | URBANRIDE | 1 | 0.5 | 1.0 | 1.0 |
| | URBAN WORLDWIDE | 4 | 2.0 | 4.0 | 5.0 |
| | DELUX WORLDWIDE | 94 | 47.0 | 94.0 | 99.0 |
| | Don't know | 1 | 0.5 | 1.0 | 100.0 |
| | Total | 100 | 50.0 | 100.0 | |
| Missing | System | 100 | 50.0 | | |
| Total | | 200 | 100.0 | | |

## XVI.   Conclusion

48.     The results of the court-compliant survey clearly proves that the marks, as the relevant public engages them in the context of both their websites and their engagement emails, are not confused as coming from the same or affiliated sources. Specifically, a net confusion score of 4.7% based on the websites and 4% based on the engagement email/form both fall well below the 15% confusion standard used to determine likelihood of confusion. Based on these statistics, I conclude that there is not relevant likelihood of confusion between the marks in question.

49.     I hold these opinions to a reasonable degree of certainty based on the survey results and my 40-plus year experience in the branding industry. I respectfully reserve the right to amend or supplement this report in the event additional information becomes available.

50.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 14, 2025

*[signature]*

**Appendix 1:**
**Documents Cited**

*1-800 CONTACTS, INC. v. Lens. com, Inc.,* 722 F. 3d 1229, 1248-49 (10th Cir. 2013)

UR00001- UR000372.pdf

UR000839 - UR000840.pdf

UWW000001-UW000203.pdf

www.google.com

https://help.uber.com/riders/search?q=improper%20invoice

https://help.lyft.com/hc/en-us/search/improper%20invoice

Confusion - Case 123-cv-06999 Urbanride Inc. v. Urban Worldwide Inc. (Our Ref. 06058-0004).msg

Manual for Complex Litigation, Fourth Edition, 2004

Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011

Reference Guide on Survey Research, Shari Seidman Diamond, West Group, St. Paul, MN, 2011

Surveys in Lanham Act Matters, Jacqueline Chorn, Marcello Santana and Brian Sowers, IP Litigator, 2020   https://ams-litigation.com/wp-content/uploads/2021/01/IP-Litigator-Article-2020.pdf

https://rmsresults.com/2010/07/07/400-is-the-magic-number-market-research-in-central-ny/

https://www.insightsassociation.org/issues-policies/glossary/council-american-survey-research-organisations-casro

http://www.illume-research.com/aboutus.html

https://www.innovatemr.com/panels/consumer-panel/

ACTIVE 703164263v2

**Appendix 2:**
**Documents submitted with this report**

**Survey screener/questionnaire:**
UrbanRideSurvey.pdf"

**Survey Results:**
UrbanRide Final Data 1_13-25"
UrbanRide Final Data 1_13-25"

ACTIVE 703164263v2

**Appendix 3:**

**Curriculum Vitae of Robert Wallace**

**Rob Wallace   Expert Witness: Brand identity**

917-860-0319
Rob@bestofbreedbranding.com
www.RobWallaceExpert.com

As the former managing partner of Wallace Church, Inc., one of the most recognized and accomplished brand identity strategy and design consultancies, I have more than thirty years of expertise in all aspects of branding strategy and design analysis for national and global brands. My core expertise is the ability to create and differentiate brand experiences that drive consumer awareness and purchase behavior.

Clients include Procter & Gamble, Coca-Cola, Unilever, Pfizer, Dell, Pepsico, Revlon, Target, The Home Depot, Johnson & Johnson, Bacardi, E&J Gallo, Mattel, Anheuser Busch, PNC Bank, Kroger, L'Oreal, s/Miracle Gro and more than 40 national/global consumer product marketers of equal caliber.

**Areas of Expertise:**
Trademark/Trade Dress
Package/Product Design
Licensing
Intellectual Property
Marketing Strategy
Brand Communications
Visual Brand identity
Advertising Claims
Consumer Research
Copyright Damages
Consumer Research
Planning/Analysis

**Industry Experience:**

| | |
|---|---|
| Food | Personal Care |
| Beverage | OTC and Rx Drugs |
| Home Products | HBA/Beauty Care |
| Wellness | Technology Brands |
| Toys/Sporting Goods | Hard Goods |
| Beer/Wine/Spirits | B to B |
| Apparel | Retailer Brands |
| Financial Services | |

**Background:**

Best of Breed Branding Consortium, LLC                    June 2014 – Present
Managing Partner

- Actively manage a consortium of branding communications consultancies.
- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Wallace Church, Inc.,                                        1985 – June 2014
Managing Partner, Strategy

- Actively manage one of the world's most respected brand identity design consultancies.
- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Peter Cris Advertising, Inc., New York, NY                1984 – 1985
Vice President, Marketing

- Provided both the strategic and creative force for this regional advertising agency.
- Acted as primary liaison between clients and creative department.

Modular Marketing, Inc., New York, NY                     1982 – 1984
Senior Account Manager

- Managed select client relationships through all creative and strategic aspects of project management for this marketing communications consultancy.
- Designed and developed brand promotion programs, corporate communications and brand identity assignments.

Grey Advertising, Inc., New York, NY                      1981 – 1982
Senior Account Manager

- Actively participated in one of the world's largest advertising agencies through the Market Horizons function, consulting with core clients on advertising and new brand communications opportunities.

**Education:**
MBA coursework, The New School, New York, NY          1981 – 1983
BA, English, Gettysburg College, Gettysburg, PA          1977 – 1981

**Professional Activities:**
•      Expert speaker on brand identity design at more than 40 marketing, design and research industry events across the US, UK, Europe, Latin America and Asia
•      Author of numerous articles and published case histories on brand identity design in the Wall Street Journal, Forbes, Marketing Week, Design Management Journal, Package Design Magazine and numerous other publications,
•      Co-Author "Really Good Package Design Explained," Rockport Press, 09
•      Lecturer on brand identity at Columbia Business School, Georgetown University, Seton Hall, University of Texas, School of Visual Arts Masters in Branding and other MBA programs of leading universities
•      Board of Directors, Design Management Institute, 2010-Current
•      Co-Chair of the Design Management Institute Design Value Project, 2012
•      Distinguished Faculty Member, Path to Purchase Institute, speaker at national conference for the last 8 years
•      Founder "The Strategic Design Firm Leadership Summit" BXP Live event

**Professional Memberships:**

Board of Directors, the Design Management Institute,
Co-Chair Design Value Project, the Design Management Institute
Distinguished Faculty, Path to Purchase Institute
American Marketing Association
Color Marketing Group
American Institute of Graphic Arts

**Appendix 4:**

**Partial List of Prior Cases**

I have served as an expert witness on branding related issues on more than 95 prior cases.  In the last four years, I have been served on:

•       Rhino Metals Inc, v Sturdy Gun Safe Inc, US District Court, District Idaho, 2019

•       American Customer Satisfaction Index, LLC v Genesys Telecommunications Laboratories, et al, US District Court, Eastern District of Michigan, Southern Division, 2020

•       I.M. Wilson, Inc v Obchtchestvo S Ogranitchennoy Otvetsvennostyou "Grichko", et al, US Distinct Court, Eastern District of Pennsylvania, 2020

•       Country Life v. The Hain Celestial Group, Inc, US District Court, Eastern District of New York, 2020

•       New NGC, Inc, et al  v. Alpinebay, Inc, US District Court, For the Northern District of Illinois, Eastern Division, 2020

•       P&P Imports v. Johnson Enterprises, LLC et al, US District Court for the Central District of California, 2020

•       New NGC, Inc, et al  v. Alpinebay, Inc, US District Court, for the Northern District of Illinois, Eastern Division, 2020

•       Otter Products, LLC et al v. Bigbirds, LLC et als , US District Court, for the District of Colorado, 2020

•       Sulzer Mixpak, A.D. v. DXM Co LTD et als , US District Court, for the Southern District of New York, 2020

•       Jalinski Advisory Group, Inc. v. JBL Financial Services, Inc., US District Court, for the Eastern District of Missouri, Eastern Division, 2020

•       American Customer Satisfaction Index, LLC v ForeSee Results, et al, US District Court, Eastern District of Michigan, Southern Division, 2021

•       Jalinski Advisory Group, Inc. v. Franklin Advisory Group, Inc., US District Court, for the Eastern District of Pennsylvania, 2021

•       Restoration Hardware, Inc., *et al*., , v. Bugalow Home, LLC, US District Court, for the Southern District of Ohio, Eastern Division, 2020

•       American Medical Experts, LLC v. Ronny Nizar Hamad, Prime Medical Experts, LLC et al, US District Court, for the Eastern District of Virginia, 2020

•       American Customer Satisfaction Index, LLC v ForeSee Results, et al, US District Court, Eastern District of Michigan, Southern Division, 2021

• Thrive Natural Care Inc. v. Thrive Causemetics, Inc, US District Court, Central District of California, 2021

• BMC Software, Inc v. Baker Hughes, a GE Company et al, US District Court, , Southern District of California, 2021

• Abbott Laboratories, Freestyle Libre, Reexamination Trade Dress Proceedings in the United States Patent and Trademark Office (USPTO), 2021

• Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc., American Arbitration Association, Los Angeles Regional Office, 2021

• Diamond Assets v Device Cycles, et al ., US District Court, Western District of Wisconsin, 2021

• I&I Hair Corp v Beauty Plus Trading Co,Inc. et al ., US District Court, Northern District of Texas Dallas Division, 2022

• Glam & Glitz Nail Design Inc. v. IGel Beauty, LLC, et al., US District Court for the Central District of California, 2022

• Certain Casual Footware and Packaging Thereof, et al., US International Trade Commission, Washington DC, 2022

• Simpson Strong-Tie Company, Inc v Mitek, Inc, US District Court for the Northern District of California, 2022

• Opulent Treasures, Inc v Portofino International, US District Court for the Central District of California, 2022

• Macy's IP Holdings, LLC v Aroma350, Inc., US District Court for the Southern District of New York, 2022

• Independent BDSI Owners Association et. al v. Super Bee Holdings, American Arbitration Association, 2022

• Ace Group International, LC and Ace Group Bowery LLC v. 225 Bowery, LLC, Arbitration Administered by the International Chamber of Commerce, 2022

• Woodstock Ventures et al v. Woodstock Roots, LLC., US District Court for the Southern District of New York, 2022

• Pecararo Latteria , LLC Trademark Application., United States Patent and Trademark Office, 2022

• Purple Innovation, LLC v. Responsive Surface Technology et al, U.S. District Court for the District of Utah, 2023

• Harmony Hospice Care LLC., V. Comfortbrook Hospice Et Al. Court of Appeals Eighth District Cuyahoga County Ohio, 2023

- Santa Barbara Polo Club, Inc. and Sb Members, LLC v. Lifestyle Licensing B.V. And Lifestyle Equities C.V., American Arbitration Association International Centre For Dispute Resolution, 2023

o

- Fox Factory v Dong Yongqiang United States Patent and Trademark Office, Trademark Trial and Appeal Board, 2024

- Rebel Athletic v. Jim Lundberg D/B/A Cs Athletic D/B/A Cheerstix et al. , U.S. District Court for the Northern District of Illinois, Eastern Division, 2024

- Lexos Media IP, LLC v. Amazon.Com, Inc. U.S. District Court for the Eastern District of Texas Marshall Division, 2024

- Lexos Media IP, LLC v. Target Corp., U.S. District Court for the Eastern District of Texas Marshall Division, 2024

- Lexos Media IP, LLC v. Office Depot Inc., U.S. District Court for the Eastern District of Texas Marshall Division, 2024

- . Decker Outdoor Corp. v. Primark US Corp., U.S. District Court for the Northern District of Massachusetts, 2024

- . Skims Body Inc. v. Vaughn Associates, Inc., U.S. Patent and Trademark Office Before the U.S. Patent and Trademark Trial and Appeal Board , 2024

- . Lagunitas Brewing Company. v. Soltura, LLC,   U.S. District Court for the Southern District of Florida, 2024

- . Ray Scott Fuss. v. Fredrick M Bensch,   U.S. District Court for the Northern District of Georgia, Atlanta Division, 2024

- . Decker Outdoor Corp. v. Last Brand., U.S. District Court for the Central District of California, 2024

- . Enviodigm Inc v. Apple Inc, et als, Superior Court for the State of California, for the County of Santa Clara, 2024

**Appendix 5:**

**Partial List of Authored Books and Articles**

I have written a number of peer-reviewed brand identity articles, contributed to branding texts, and have been interviewed by The Wall Street Journal, The New York Times, and more than a dozen branding and marketing communications industry publications. I have spoken at more than 30 marketing communications and design industry events across North and South America, the UK, Europe and Asia.  I have lectured on brand identity at Columbia Business School, Georgetown University, The University of Texas, and other leading universities. I have conducted webinar events with more than 1,600 participants on the topic of design process and design thinking.

I was on the Board of Directors of the Design Management Institute, the most prominent global design industry association, and I co-chair its Design Value Project. I am a Distinguished Faculty Member of the Path to Purchase Institute.  Please see my current CV for a listing of these and other accomplishments.

I coauthored a book entitled "Really Good Packaging Explained", released in 2009 by Rockport Publishers.  I was also a contributing author with Robin Landa and the book "Build Your Own Brand", Rockport, 2013.  I also wrote the forward to Christopher Durham's book, "52 The My Private Brand Project", Folio28, 2014

In the past 15 years I have written the following articles:

- "The Tropicana Trouble and How It May Have Been Prevented", Package Digest, 2009
- "Blood, Sweat and Tiers, Building Optimal Brand Identity Architectures", GAIN, AIGA Journal of Business and Design, June 2008
- "Heinz Turns Iconic Authenticity Into Fresh Relevance", The Hub, September 2007
- "Design ROI Envisioned", Step Inside Design, July/August 2007
- "Be Smart Be Simple", Design Management Review, Spring 2006
- "Proving our Value: Measuring Package Design's Return on Investment", Design Management Journal, Summer 2001
- "The High Cost of Saving Money", Package Digest, Summer 2000
- "Icons, Your Brand's Visual Essence, Brandweek, Spring 2000

I have coauthored an article with Pamela De Cesare, former Associate Director of Package Communications, Kraft Foods, Inc., entitled "Amazing Pace, Shared Views on the Design Process", Design Management Journal, Spring 2000.

In the past several years I have posed more than two dozen articles and posts on Wallace Church's web site: http://wallacechurch.tumblr.com/ these include but are not limited to:

• "Quantifying Design's Value"

• "Design RI Re-Envisioned",

• "Cutting through the Sea of Sameness"

• "Architecting a Brand Experience"

• "The National Color" and more

I am the founder of the Linked In Group- "Relevant Disruption in Branding"
https://www.linkedin.com/groups?home=&gid=7422931 where I have posted more than 10
articles including:

• "Right Here, Right NOW!"

• "Fashion Touchdown"

• "Color is Key"

• "Cool Customization"

• "Relevance for Right Now"

• "Shape Language"

• "Visual Vampires"