**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

URBANRIDE, INC.,
Plaintiff,

v.                                          Civil Action No. 1:23-cv-06999

URBAN WORLDWIDE, INC.
Defendant

**Response to David Franklyn's Rebuttal of Rob Wallace Report**

Rob Wallace

February 27, 2025

I.      <u>Introduction</u>

1.      I was engaged by Morris, Duffy, Alonso Faley & Pitcoff, LLC, counsel for Defendant, Urban Worldwide, Inc., to provide my expert opinion in the matter of UrbanRide, Inc. versus Urban Worldwide, Inc.   I filed my report dated January 14, 2025. This report was then critiqued by David Franklin in his February 13 rebuttal .  What follows is my response addressing the criticisms raised by Franklyn concerning my expert survey and findings on the likelihood of confusion between UrbanRide and Urban Worldwide.

2.      Franklyn's rebuttal misrepresents several critical aspects of my methodology, calculations, and conclusions. This response corrects one miscalculation made in my original report and then addresses the inaccuracy of Franklyn's critiques as it reaffirms the validity of my reported findings.

## II.     Miscalculation of Net Confusion Results

3..     Franklyn claims that my net confusion rate should have been calculated at 14.5%. This is the one correct statement in Franklyn's rebuttal. This correction, which I acknowledge, still places the net confusion level below the 15% threshold commonly used in court rulings to indicate significant consumer confusion[1].

4.     My initial miscalculation resulted from an improperly formatted results tabulation chart provided to me, causing me to misread the valid percentage column. Specifically, the tabulated result charts below were incorrectly presented with the "valid percent" listed as 100% (third column). Consequently, I mistakenly used the figures from the "percent" column (second column) as the valid percent and cited these incorrect figures in my report.

---

[1] Courts will often state that a survey finding 15% or more is sufficient to support likelihood of confusion, while under 15% suggests no likelihood of confusion. *See, e.g.,* *1-800 CONTACTS, INC. v. Lens. com, Inc.,* 722 F. 3d 1229, 1248-49 (10th Cir. 2013) (discussing survey findings on the low end).

**Q10a - Do you believe that any of these websites come from the same or affiliated companies?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBANRIDE and URBAN WORLDWIDE are the names of the same or affiliated limousine companies | 24 | 12.0 | 100.0 | 100.0 |
| Missing | System | 176 | 88.0 | | |
| Total | | 200 | 100.0 | | |

**Q10a - Do you believe that any of these websites come from the same or affiliated companies?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBANRIDE and DELUX WORLDWIDE are the names of the same or affiliated limousine companies | 9 | 4.5 | 100.0 | 100.0 |
| Missing | System | 191 | 95.5 | | |
| Total | | 200 | 100.0 | | |

**Q10a - Do you believe that any of these websites come from the same or affiliated companies?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, URBAN WORLDWIDE and DELUX WORLDWIDE are the names of the same or affiliated limousine companies | 20 | 10.0 | 100.0 | 100.0 |
| Missing | System | 180 | 90.0 | | |
| Total | | 200 | 100.0 | | |

- 

5.      However, this correction does not alter the fundamental conclusions of my report. When the proper net results are computed, as Mr. Franklyn agrees in his rebuttal, they indicate 14.5% net confusion, which is still under the 15% net findings used as a

standard for ruling on confusion. Courts have recognized that survey evidence indicating a confusion rate of 15% or higher can serve as strong evidence of a likelihood of confusion. For instance, in *Exxon Corp. v. Texas Motor Exchange, Inc.*, the Fifth Circuit noted that a survey showing 15% confusion constituted "strong evidence" supporting a likelihood of confusion, especially when corroborated by other supportive evidence.[2] In *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, the Seventh Circuit Court of Appeals addressed the issue of trademark infringement concerning the "BEEFEATER" mark. The court found that a consumer survey indicating that at least 15% of the restaurant-going public would mistakenly believe that the distiller was sponsoring or promoting the restaurant was sufficient to establish a likelihood of confusion. This confusion rate was deemed more than de minimis and supported the plaintiff's right to relief.[3]

6.      I agree with Mr. Franklyn that the net confusion rate should be calculated as 14.5%. However, I reiterate that this correction does not alter the fundamental conclusions of my report, as both Mr. Franklyn and I acknowledge that the survey results demonstrate a confusion rate below 15%.


**III.      Validity of Including Both Website and Email Stimuli**


7.      Franklyn asserts that my survey improperly combines website and email stimuli, leading to respondent priming and bias. However, my methodology reflects the actual user engagement experience, where drivers first register via a website and later

---

[2] *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, the Seventh Circuit Court of Appeals
[3] *Exxon Corp. v. Texas Motor Exchange, Inc.*, the Fifth Circuit

engages through emails for each individual bookings. Excluding one of these elements would misrepresent the engagement process.

8.    Franklyn claims this leads to priming and biasing, but he provides no evidence of that.  In fact, when responses between the primary questions are analyzed, there are inconsistencies which indicate that no bias exists.


### IV.    Appropriateness of the Squirt Survey Format


9.    My survey was based on a "two room" Squirt format using both a primary and control stimuli across a test and control set of 100 respondents each.  Exposing both stimuli in question with a proper control is Squirt-compliant.


10.    Franklyn challenges my use of a Squirt-style format, arguing that UrbanRide and Urban Worldwide do not co-exist in a competitive market. In contrast, my review of geographic overlap and driver usage patterns confirms that both brands operate in many of the same regions and that drivers frequently engage with both firms. This real-world coexistence justifies the Squirt methodology, which courts accept when brands "… are simultaneously or sequentially accessible in the marketplace for comparison. It relies on the 'proximity' factors (e.g., overlapping customers, channels of trade and advertising) in a likelihood of confusion analysis, rather than on the strength factor, as its market replication rationale." [4]

---

[4] Swann, Jerre B. "Likelihood of Confusion Studies and the Straitened Scope of Squirt." *The Trademark Reporter*, vol. 98, no. 4, May-June 2008, pp. 755-756.

11.     Franklyn claims that the use of Squirt was not "supported by the facts in this case" but fails to clarify what "facts in this case" disqualify it from using a Squirt-based format with a primary and control set.  I have personally testified for dozens of courts who have accepted court-compliant Squirt format surveys. I know of no issues in this case that would prevent that methodology from being court-accepted, and Franklyn provides no evidence to support his claim about the Squirt survey format.

**V.      Appropriateness of the Squirt Survey Format**

12.     Franklyn correctly states "Squirt requires that the services co-exist in the marketplace together." I have reconfirmed that UrbanRide and Urban Worldwide co-exist in numerous geographic areas and that there are numerous drivers who work for both companies. I conclude from this fact that there are a significant number of real world situations in which both UrbanRide and Urban Worldwide marks are likely to be seen by the relevant public of drivers in the marketplace sequentially, specifically when a driver is signing up for both services and has both sites sequentially up on a browser and when a driver is engaged by both services in the same day and receives each email. This ensures the "competitive proximity" of the marks that validates a Squirt-based survey to be used to analyze the potential confusion between them.

**VI.     Survey Question Design and Confusion Measurement**

13.    Franklyn criticizes my confusion question because it did not ask separate questions for same, affiliated, or sponsored/approved companies. However, I contend that respondents who perceive two companies as "affiliated" implicitly recognize some degree of sponsorship or approval. If any respondents believed that these sources were sponsored/approved by each other, they would have likely responded that they were affiliated with each other. Confusion regarding affiliation often encompasses perceptions of sponsorship or approval. The Lanham Act addresses this by prohibiting the use of marks that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association... or as to the origin, sponsorship, or approval of... goods."[5] This indicates that confusion about affiliation inherently involves assumptions about sponsorship or approval. Therefore, when respondents perceive two companies as "affiliated," it implies a belief in some level of sponsorship or approval between them.

14.    Furthermore, Franklyn provides no evidence suggesting that separating these terms would have significantly altered the results.

**VI: Biasing questions**

15.    Franklyn criticizes my confusion question because it asks respondents to review websites from "several companies" suggesting that they were sites from different sources. Firstly, the sites themselves have entirely different designs, layouts and marks. For example: please note the following images of the site and notice how their shape,

---

[5] Lanham Act, Section 43(a), 15 U.S.C. § 1125(a).

photos, colors, typefaces and specifically their source identifying logos are significantly different from one another.



...



## URBAN WORLDWIDE

### Private Car Service and Chauffeured Luxury Transportation

For over 40 years, Urban Worldwide has been the trusted provider of luxury private car service and chauffeured transportation in San Francisco and beyond. We have experience we count on and 750 cities worldwide to bring us a global team about industry.

Having stood for a unique team of industry professionals, we have a commitment to our driver, reputation standards of service, and modern luxury fleet we have our trended way to be the super most. Urban requires and over to request our services, standard rig experience only with 100% and more, also to ensure all of us in and slightest results.

In 2022, we announced an company-wide release and expanded its Chauffeur and Services in Los Angeles. Now operating provides Urban Worldwide LLC has acquired an agenda ally enhanced our presence in California, the take once in consistently on easing invocation and dynamic through these services to every aspect of their customer luxury travel industry.

Choose Urban Worldwide for the ultimate luxury transportation experience.





**Airport Car Services**

Urban Worldwide provides airport transportation to and from SFO, LAX, SMF, HNL, and can arrange transfers around the world.

**Executive Transportation**

Professional rely on our business travel clients know and trust, no matter where you're traveling.

**Business Meetings & Corporate Events**

Business meetings, corporate events, timing, and deadlines are critical. Trust us with your most important logistics.





**Limo Service for All Occasions**

Elevate every experience with chauffeured service to take you anywhere you want to go.

**Event Transportation**

Our premier group transportation services for events ensures seamless, comfortable experiences for all in attendance.

**Point-To-Point / Hourly Chauffeur Service**

Book hourly chauffeur services for sightseeing, private tours, day trips, in San Francisco and more.





**Winery Tours**

Experience Napa, Sonoma, and more with group outings, luxury getaways, and exclusive tastings.

**Wedding Transportation**

An event to remember, forever. Let our professional wedding transportation team handle the details.

**Commuter Services**

Our customized commuter services offer a convenient and cost-effective transportation solution for businesses and educators institutions looking to provide reliable transit options for their employees and students.








## OPENING THE DOOR TO A NEW LEVEL OF CHAUFFEURED TRANSPORTATION

Wherever you are, so are we. Upgrade your ride with premium luxury transportation in over 700 cities around the world including San Francisco, the Bay Area, Sacramento, Los Angeles, and Hawaii.



16.     The designs of these websites are so radically different from one another that I don't believe that their description as coming from "several companies" impacted perceptions in any way.

17.     Even if the question, "You review websites for several third-party limousine companies," did bias respondents in any way, it is logical to assume that respondents would have indicated the companies were different but affiliated, answering "YES" to the question: "Do you believe that any of these websites come from the same or affiliated companies?"

**VII: No aggregate confusion measured**

18.     Franklyn suggests that combining "same" and "affiliated" responses prevents the measurement of "aggregate confusion." This is incorrect. The survey explicitly asked, "Do you believe that any of these websites come from the same or affiliated companies?" Any "YES" response inherently measures aggregate confusion—whether respondents view the companies as the same or affiliated. Importantly, I affirm that "affiliation" implies "sponsorship or approval." Thus, respondents who believed these websites were sponsored or approved by each other would naturally indicate that they were "affiliated." Franklyn's claim regarding bias is unsubstantiated, as he fails to provide any evidence that a different phrasing would have yielded a meaningfully different result.

**VIII:  Use of Engagement Emails in Measuring Confusion**

19.     Franklyn dismisses my inclusion of engagement emails as irrelevant, characterizing the response analysis as a mere "reading test." This critique fails to acknowledge that these emails are critical real-world stimuli through which drivers interact with the brands. The survey design accurately reflects this engagement process, making these stimuli essential to evaluating actual confusion.

20.     Furthermore, some respondents answered incorrectly.  If this question were merely a "reading test" as Franklyn claims, I would have anticipated all answers would have been exactly the same and accurate to their source.  Again, this was not the case.

**VII.    Proper Use of Control Groups**

21.     Franklyn states, "A proper test and control design requires that survey respondents be randomly assigned to one of two groups (or cells), a test cell and a control cell. In the test cell, respondents are shown stimuli including the marks being tested. In the control cell, respondents are shown other stimuli, with specific changes made to the test stimuli such that the control stimuli does not contain any of the allegedly infringing marks." My survey achieved this strategy in two ways.

22.     Firstly, when analyzing the websites in question, question 10a exposed the initial 100 test-cell respondents to the primary websites (UrbanRide and Urban Worldwide) along with the control website (Delux Worldwide). After accounting for survey noise—specifically, 20% of respondents believing Urban Worldwide and Delux Worldwide were

the same or affiliated—the primary stimuli resulted in 24% confusion between Urban Worldwide and UrbanRide. Subtracting this 20% noise yields the reported **net confusion rate of 4%** among this first group of 100 respondents.

23.    As detailed in my report, similarly, among the second group of 100 control-cell respondents, question 10b shows that extracting the 18% confusion (respondents who believed Urban Worldwide and Delux Worldwide were the same or affiliated) from the 21% confusion found with the primary stimuli (Urban Worldwide and UrbanRide) yields a net confusion rate of 3%. When the results from both groups of 100 respondents are combined and averaged, the total of 200 respondents surveyed indicates a net confusion rate of 3.5%. My original report incorrectly stated this figure as 4.7%. Updating this number accurately reflects the survey results. This correction does not alter the conclusion that confusion remains below the 15% threshold commonly cited in case law.

24.    Secondly, my two-room survey then exposed the first 100 respondents to the UrbanRide and Urban Worldwide engagement emails. The second group of 100 respondents viewed engagement emails from the primary stimulus, Urban Worldwide, and the control stimulus, Delux Worldwide. Contrary to Franklyn's claims, this approach follows a court-compliant two-room survey protocol.

25.    Franklyn states:  "How swapping out an engagement email from URBANRIDE with one from DELUX WORLDWIDE serves as a control is not explained by

Wallace." This is not true. Section XV of my report entitled Control Questions and Stimuli, specifically states:

> "This survey employed a design using a test versus a control format. This is used to determine the impact of a variable of interest beyond the baseline level of impact of exogenous variables in the marketplace so as to extract "survey noise" or responses that may not accurately represent the opinions of the relevant consuming public because some respondents may not have been paying full attention or speeding though the survey. This process is also used to validate the primary results. This process asks the identical questions to a separate segment of respondents based on different but similar stimuli. If the results among the control set are similar to those of the primary set, this validates the accuracy of these results "[6].

26.    In my experience, courts value survey results that are validated through a test and control format, specifically when the results of the primary and control set are similarly comparable. Based on this criteria, I selected a comparable but non infringing DELUX WORLDWIDE brand website and engagement email stimuli indicated below:…

---

[6] (Reference Guide on Survey Research, Shari Seidman Diamond, West Group, St. Paul, MN, 2011, pp 258



**VIII: Franklyn fails to mention that different engagement emails were presented to the test and control sets**

27.     In his inaccurate critique asserting that my survey did not follow proper two-room survey standards, Franklyn fails to acknowledge that only the Urban Worldwide and UrbanRide emails were shown to the first test set of 100 respondents, while only the control emails (Urban Worldwide and Delux Worldwide) were presented to the second set of 100 respondents. This methodology effectively isolated survey noise and clearly demonstrated differential confusion rates between the test and control cells. I adhered fully to court-compliant protocols for a two-room survey. Moreover, the net confusion results from this part of the survey (5% for the initial 100 test-cell respondents and 4% for the subsequent 100 control-cell respondents) were accurately reported in my original analysis.

28.    Franklyn's statement, "The lack of a proper control is a fatal weakness and completely undermines the credibility of the Wallace Survey," is not correct because there were proper controls used in both the website and the engagement email analysis.

**IX: Definition of the Relevant Universe**

29.    It is my understanding from the complaint and my review of the evidence of actual confusion that the confusion at issue involves a small number of drivers or third-party aftermarket companies incorrectly billing their services. These individuals represent precisely the "consumers" referenced by Franklyn. I am unaware of any reported confusion among individuals who use ride services themselves, which confirms that my survey correctly targeted the appropriate universe.

30.    Franklyn also critiques my screener, which required respondents to have worked in the limousine industry within the past 12 months and to intend to continue working in the industry for the next 12 months. This criterion is standard practice and one I have consistently employed in my surveys, both as an expert witness and as a branding/marketing consultant. It ensures the survey captures respondents with sufficient industry experience rather than those who are newcomers or intermittent participants lacking relevant knowledge. Interestingly, Franklyn himself endorses this approach later in his rebuttal, stating: "Wallace should have shown respondents a list of jobs, one of which being limousine services, and asked respondents if they have

worked in the following industries within the last 12 months and additionally asked if they plan to work in the following industries in the next 12 months."

31.    Regarding the requirement that a proper screener should provide respondents with a list of occupations rather than a single option, all of my survey screeners specifically targeted the relevant industry. I have seen no evidence of the "yea-saying" bias Franklyn alleges, and Franklyn himself does not provide evidence of such bias. Using the same source Franklyn cites, my screener and survey satisfy all the necessary criteria.

## X: Screening question

32.    Franklyn states that my screening question was "a 'double-barreled' question requir[ing] a survey respondent to parse through a confusingly worded question  to determine whether they can answer the question affirmatively or not."   I saw no evidence of any respondent misunderstanding this standard screening question:

> *"In the last 12 months have you worked in the limousine industry and contracted rides directly through third-party sources that connect you with clients?  Have you then billed these third-party companies for your services?  Do you plan to continue to do so in the next 12 months?"*

The screening question explicitly restricted respondents to those who contracted rides through third-party sources, ensuring the survey reached only relevant drivers.

33.     Franklyn believes that this screening question would include those service providers in the limousine industry who are not drivers. This is not true because the question specifically requires that the respondent had "contracted rides through third party sources that connect you with clients." Only drivers fit this criteria.

34.     Later, Franklyn argues that the follow-up question, "You are interested in working for a third-party limousine company that will hire you to accept rides for their customers," adds ambiguity. However, this question explicitly ensures that only drivers—not other service industry employees—would qualify. Rather than increasing ambiguity, this question further clarifies the intended respondent group for my survey.

**XI: My survey excluded those taking it on a cell phone**

35.     Franklyn states "Wallace excludes mobile traffic entirely and suggests that respondents would have been allowed to take the survey on their cell phone because "consumers are likely to solicit limousine services via a mobile phone." While this statement may be true, allowing respondents to complete surveys on mobile devices can limit their ability to properly view the stimuli. In all the surveys I have designed—both as an expert witness and a brand consultant—I have consistently required that they be conducted on a desktop, laptop, or tablet. This requirement does not introduce bias; rather, it ensures the validity of responses by allowing respondents to clearly see the stimuli and read the questions.

**XII: Survey pool size**

36.      Franklyn suggests that the 200-respondent sample used in my survey is not court-compliant. This is incorrect. Determining an appropriate sample size depends on several factors, including the total population size, desired confidence level, and acceptable margin of error. In cases where the target population is relatively small, such as a specific group of limousine drivers, achieving a 95% confidence level with a ±5% margin of error often requires a sample size smaller than 400. Courts have recognized that the adequacy of a survey's sample size depends on the context and target population. Smaller sample sizes can be valid when they accurately represent the relevant consumer group.

**XIII: Use of Website Stimuli and Presentation of Brand Names**

37.      Franklyn asserts that displaying the names of the companies above website stimuli biased respondents. He states "By placing the name of each company directly above the stimuli (which deviates from how the websites appear in the marketplace), Wallace effectively instructs respondents that each of these websites come from different companies." However, Franklyn fails to acknowledge that the names of these sites naturally appear in the URL banner above each site, as shown in the screenshot below:



I simply increased the size of the URL descriptor so it could be easily seen, as indicated in this blown up image from the UrbanRide site:



38.     My survey stimuli did not include anything respondents would not naturally encounter during the engagement process. Since domain names are visible in real-world browsing conditions, my survey simply ensured clarity in viewing. This does not introduce bias but rather serves as a practical adaptation to enhance respondent comprehension.

**XIV: Representation of Full Web Pages in Stimuli**

39.     Franklyn states "These truncated pages show only the clickable menus and a single image and small set of text for each webpage." He later states. "The full webpages of URBANRIDE and URBAN WORLDWIDE, as shown in Exhibit D, provide respondents with much more information and context…" and illustrates them below:




40.     Firstly, my stimuli accurately represented the "above the fold" portion of the website—the area immediately visible without scrolling. Secondly, displaying the full site would have reduced readability. Most importantly, the remaining portions of the sites differ significantly from one another, and the Urban Worldwide source is so clearly re-

emphasized that, if the full sites had been shown, I would expect an even lower reported level of confusion between them.

## XV: Delux Worldwide site

41.     Franklyn states that the stimuli used for the control website, Delux Worldwide, were improper because they featured the limousine service page rather than the entire homepage. Delux Worldwide provides both limousine and bus services. I selected the limousine service page specifically because it represents what drivers typically encounter when booking limousine services—comparable to UrbanRide and Urban Worldwide. It's also relevant to note that had I used the Delux Worldwide homepage, its appearance is much more similar to Urban Worldwide's, as illustrated below, which could have resulted in greater control confusion and thus a lower net confusion rate. Based on this analysis, I believe my survey stimuli were accurate and court-compliant.





## XVI: Email Stimuli and Alleged Formatting Bias

42.      Franklyn claims that the stimuli used for the UrbanRide email were altered and biased respondents. He argues that adding the UrbanRide logo and a red underline influenced respondents' perception of its source. However, there is little evidence to support this claim. Franklyn cites only one out of 200 open-ended responses that mention the red underline and none that reference the logo. He identifies seven open-ended responses that mention the "header," "the name on the letterhead," or "email

domain" as reasons why respondents believed the email originated from UrbanRide. However, the actual UrbanRide email contains a similar "header," "name," and "email domain," as illustrated below:

From: dispatch@urbanride.com
Subject:  UrbanRide New Reservation for ███████ - PO ████████

43.     Franklin states, "there is no "URBANRIDE" logo at the top of the email nor is there any signal (such as a red underline) as to who sent the email." This is simply not true.  The From: dispatch@ urbanride.com is highlighted in blue and the "Subject: UrbanRide New Reservation" are most prominently featured as the source of this email.  As a result I believe my survey results are accurate.


**XVII: Quality control measures**


44.     Franklin states that my survey did not detail the quality control metrics used nor provide data on those respondents who did not meet the screening criteria or were either speeders or laggers, those not giving the survey their full attention. This is also not true. My report explicitly details these procedures.


45.     In fact, Franklyn cites section XII, paragraphs 30-32 of my report that details the quality control measures used by both the paneling firm, Innovate MR, and the survey fielding firm, Illume. In addition, in the raw data files provided with my survey, the first column assigns a number to each respondent engaged.  Only accepted respondents' data was collected. As indicated in a section of this raw data file below, there were

seven respondents who did not qualify before the first qualified respondent (eg 8) was

engaged.

| ID | Q1 | Q2 | Q3 |
|---|---|---|---|
| 8 | 1 | 4 | 2 |
| 9 | 1 | 3 | 1 |
| 14 | 1 | 7 | 2 |
| 16 | 1 | 4 | 2 |
| 17 | 1 | 5 | 2 |
| 18 | 1 | 6 | 2 |
| 19 | 1 | 6 | 1 |
| 22 | 1 | 5 | 2 |
| 24 | 1 | 3 | 2 |
| 25 | 1 | 4 | 2 |
| 28 | 1 | 4 | 1 |
| 29 | 1 | 5 | 1 |
| 30 | 1 | 6 | 1 |
| 31 | 1 | 6 | 1 |

46.     This data chart confirms that there were 399 respondents engaged and 200 of

them that met the screening criteria and whose data was collected.

**XVIII. No survey programming instructions provided**

47.     Franklin states that I "did not provide a survey script or programming instructions

that included clear programming logic, question numbering, or other

standard information that is provided by survey experts in matters like this."  The survey

screen shots were provided with my report, UrbanRideSurvey.pdf, and the original script

and programming directions are indicated in the document attached to this response: URBANRIDEvURBANWORLDWIDESurvey12_16_24.  I have rarely been asked to provide this with my prior reports.

### XIX. Screenshots do not indicate randomization

48.    Franklin states that "the screenshots provided by Wallace suggest that presentation of stimuli and answer choice options were actually not randomized."  I can assure the court that the stimuli and closed ended responses were all presented in randomized order, as directed in URBANRIDEvURBANWORLDWIDESurvey12_16_24 script attached to this report.  The screen shots did not reference this randomization.

### XX. Secondary Meaning of the UrbanRide Mark

49.    Franklyn disputes my opinion that the UrbanRide mark may lack secondary meaning. While no secondary meaning survey was conducted due to budget constraints, it is the plaintiff's burden to establish distinctiveness before confusion claims can be assessed. The widespread use of "Urban" and "Ride" in transportation further suggests that the mark is not inherently distinctive.

### XXI: Analysis of Actual Confusion Evidence

50.     Franklyn states that I "misanalysed 24 examples of actual confusion in the marketplace where the wrong company was invoiced" assigning this confusion to drivers when (Franklyn assumes) these invoices were from third party limousine companies. The source of these invoices are irrelevant. The metrics I provided in my report were based on a conservative estimate of the number of rides that both companies have provided over the number of years they have both been in business.  Each of those rides were invoiced to either UrbanRide or Urban Worldwide, and there is evidence of only 24 cases where these invoices were sent to the wrong company. I believe the metrics I provided in my report are still worth strong consideration. I encourage the court to require an accounting of the approximate number of invoices that both firms have offered since their co-existence, and then determine the accuracy of my conservative estimate that only .008% of all transactions/engagements indicate confusion.

**XXII: Conclusion**

51.     With the exception of my miscalculating net website confusion caused by misreading the improper survey tabulation charts provided, as outlined in paragraph 1, and my mathematical correction of 3.5% net confusion among the emails detailed in paragraph 10, I affirm that my survey results and the opinions expressed in my report are accurate. Franklyn's critiques are largely speculative and fail to demonstrate substantive flaws in my research design. The core conclusion of my report—that the

likelihood of confusion between UrbanRide and Urban Worldwide is minimal—remains unchanged. I stand by my survey findings, its methodology and my expressed opinions.

Executed on February 27, 2025

**Appendix 1: Citations**

Franklyn, David. *Rebuttal Report of David Franklyn in UrbanRide v. Urban Worldwide.*

Exxon Corp. v. Texas Motor Exchange, Inc., 628 F.2d 500 (5th Cir. 1980).

James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266 (7th Cir. 1976).

Blog Post on Likelihood of Confusion Threshold. *Written Description Blog*, 2019.

 https://writtendescription.blogspot.com/2019/05/likelihood-of-confusion-is-15-magic.htm.

Diamond, Shari Seidman. *Reference Guide on Survey Research*. West Group, St. Paul,  MN, 2011.

Swann, Jerre B. "Likelihood of Confusion Studies and the Straitened Scope of Squirt." *The Trademark Reporter*, vol. 98, no. 4, May-June 2008, pp. 755-756.

SquirtCo v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980).

McCarthy, J. Thomas. "Survey Formats—The Squirt Format for Testing the Likelihood of Confusion Issue." *McCarthy on Trademarks and Unfair Competition*, 5th ed., § 32:174.50.

Lanham Act, Section 43(a), 15 U.S.C. § 1125(a).

Barber, William G., and Giulio E. Yaquinto. "The Universe." *Trademark and Deceptive Advertising Surveys*, edited by Shari S. Diamond and Jerre B. Swann, 2nd ed., 2022. United States v. 43½ Gross of Rubber Prophylactics, 65 F. Supp. 534 (D. Minn. 1946).

UrbanRide Website. *UrbanRide*, https://urbanride.com.

Delux Transportation Website. *Delux Transportation*, https://deluxtransportation.com.

Urban Worldwide Website. *Urban Worldwide*, https://urbanworldwide.com.